May it please the Court, Your Honors. This Court should reverse the Court of International Trades holding that the Department of Commerce is required to forego the imposition of countervailing duties on these Chinese tires because the same tires are also subject to anti-dumping duties calculated under the non-market economy methodology for calculating anti-dumping duties. The Court of International Trade did not err in rejecting the argument raised by GPX and Tutrick in this case. The statute says any country, but you still have to compute the subsidy. How do you compute a subsidy on a government run enterprise? Your Honor, the Department of Commerce has determined going back to the 2007 investigation line paper in China, which was the subject of the Georgetown Steel memo that you see in the joint appendix, that despite the fact that prices in China are generally too distorted to allow for the calculation of dumping duties using market economy methodologies, that there is nevertheless a transitional economy that is present in China these days that does allow for a benefit from the government to be identified in that. I hesitate to point out that you are avoiding answering my question pretty decidedly. You are talking about general theories of whether or not China has changed, but how do you compute a subsidy? Now, at least with anti-dumping, you've got something to compare it with. You've got surrogate countries. You've got market prices in one place, prices in another place. You've got comparisons you can make. You're guessing about how you compute a subsidy, aren't you? They're not guessing, Your Honor. It's very How can you be otherwise when it's a government run entity? You don't know what part of what the government is running is from the government and what part is induced by the private enterprise aspect of what they're doing. How do you separate those? Well, even before this determination, Your Honor, it's been determined by the Department of Commerce that individual Chinese producers are not part of a large conglomerate of the separate rates in anti-dumping determinations rather than simply an all-China anti-dumping margin. So there is a test which is applied to producers to determine whether they are subject to de jure or de facto government control such that they shouldn't be allowed to That works all real well in an anti-dumping context where you are comparing market prices in one place and another place. You're now just looking at the Chinese business. Tell me how you know what part of that is subsidy and what part of it is not. Well, what they've done is, and it's shown in the record in this case, they've identified the subsidies by references to benchmark prices either in China itself What is the subsidy? I didn't get a clear picture of that from the rates. What is the subsidy? How is it granted? Excuse me, Your Honor, which subsidy? What is the subsidy we're talking about? What are subsidies? What are they? Well, there were several subsidies. Some of them were provision of certain raw materials at less than market rates by the Chinese From another Chinese company? From Chinese state-owned companies. Some of them might be the provision of loans at favorable rates From whom? From Chinese banks, state-owned banks The government? Generally, this is the government. And in each instance, the department very carefully looked at the nature of the transaction involved, considered what as a benchmark would be used to determine the amount of that benefit to the particular Chinese producer, and then following the command of the statute, which is very clear, as Your Honor pointed out, any country, determined that they were required to countervail those benefits because Congress has very specifically directed that whenever the Commerce Department can identify and measure a countervailing subsidy, that they are required to countervail the entire amount of that. And notably, and this goes to the reason why we disagree with the Court of International Trade's reasoning, there is no analysis that is required or really permitted in determining whether or not a particular subsidy was flowing down into the prices of that Chinese producer such that there is a need to coordinate How is this different from the claim that there were subsidies from state-owned enterprises in Iron Curtain countries? We're talking about things coming from a state-owned enterprise, right? It's not as though there's a sort of explicit gift from the Chinese government to the private company. In many instances, and this is reflected again in the Georgetown Steel Memo, where the transitional nature of China's economy was first recognized by the Department of Commerce as allowing it to identify these subsidies, which at the time of, for example, the Georgetown Steel decision dealing with the Soviet bloc countries in the 1980s, it was viewed that the command nature of those It was impossible to identify any division between the government, a government-owned enterprise, and any other producer in those countries. Let me read just one line. I could read many, as you know, but let me read one line from the Georgetown case. Even if one were to label these incentives as a subsidy, and that's effect be subsidizing themselves. Has that changed? Yes, that has changed, and that's what's identified in Commerce's... But has that changed as a... I'm asking the question, has that changed as a matter of law? I understand you'd like to construe that as a factual question and make it something you can resolve without the court's help. Is this a factual or legal? What is this? Well, it was an analysis that went into the courts upholding the Department of Commerce's determination on a Chevron 2 type analysis in determining that the department was reasonable at that time in determining that they could not identify a bounty or grant that had been any in that particular instance. Therefore, there was no ability to apply the countervailing duty law. It was simply impossible. What does it do with this case? Well, Your Honor, it still is good law for the purpose of holding that where it's impossible because of the nature of the economy that's being considered to identify and measure a Should we then adhere to this as long as you can't convince us you can measure a subsidy? That seems to be what Judge Rustani did. She looked at this with great detail and said, you're not telling me what a subsidy is and what a subsidy has been identified in any economic terms. Why don't we uphold her on that? Well, I think you're misquoting from her reasoning, Your Honor. In fact, Judge Rustani actually in one of the remand determinations went so far as to actually ask the Department of Commerce to further countervail additional subsidies that hadn't been the subject of Commerce's original determination because they had been provided earlier than the cutoff date that the department had identified for measuring subsidies. So in a sense, that wasn't the position. The court's problem was not that she couldn't identify that Commerce is able to identify and measure subsidies, something which is very discretionary and is certainly supported by substantial evidence in Commerce's decision. What her problem was with this analysis was the perceived double remedy problem, which and I can see my time is up, but as we've pointed out in our brief, these are separate remedies for separate problems. Anti-dumping law deals with the problem of price discrimination. Countervailing duty law deals with the problem of government-provided benefits. There isn't a coordination problem there. Could I ask you one other question? And that is on the legislative ratification issue. I read the 1988 legislative history and the 1994 legislative history. It seems to me that the congressional committees dealing with the legislation at both of those times are approving the Georgetown decision and saying that the Georgetown decision says that you can't have countervailing duties in non-market economies. So why don't we have legislative ratification here with respect to one or both of those instances? I understand that the 1988 legislative history relates to a bill which I guess was ultimately vetoed by President Reagan, but there was a version of that reenacted later. So it seems to me it's relevant legislative history nonetheless. Yes, but the legislative history does not identify how any of the members of Congress actually read the Georgetown Steel opinion. What has happened over the years is that- Well, it says which- I recognize, Your Honor, that it refers to NME countries, but what- It says it says specifically, countervailing duty law doesn't apply to non-market economy country. It was used as an overbroad simplification of the holding, which was very specific in the decision to the Soviet Union and East Germany. Well, suppose we disagree with you. Suppose we read Georgetown Steel as broader as applying to all non-market economies. Then you've got a problem with legislative ratification, right? Well, if we pointed out in our briefs, particularly in the solid waste agency case, to find a legislative ratification based on this sort of thin read is inconsistent with Supreme Court precedents, which have basically said that both agency practice and legislative history relating to prior decisions are generally not going to be sufficient to find that Congress intended to adopt a particular meaning of that practice into legislation unless it's very obvious, and this certainly isn't that. Thank you, Mr. White. The court notes that the reference to NME is non-market economy, not enemy. Thank you, Your Honor. Mr. Stewart. Thank you, Your Honor. Let me go back over a few of the questions that you asked the government counsel. There are eight programs that were found to be countervailable subsidies. In this case, they go from tax forgiveness, different tax rates, type of programs that are typically found to be countervailable in many countries when they are provided for debt in this particular context in a private case. Can't you handle all that under the anti-dumping statutes? No, you can't, Your Honor. Why can't you? Particularly the forgiveness of debt is an issue that is not addressable under the anti-dumping statute. Why isn't it a subsidy? We deal with this all the time in anti-dumping contexts. And if you've got a subsidy, you factor it into one side of the anti-dumping equation and you nail it that way. That's not. Why is it unavailable? That's not the way to look at it, Your Honor. The answer is with subsidies, as this court has itself said, provide a different remedy for a different wrong. So there are eight. But even if there are subsidies, then why doesn't it fall under the rubric of Georgetown Steel that's, in effect, they're subsidizing themselves? Well, if you go back to the 84 decisions of the agencies which were affirmed by the court, what you will find is that you had a monolithic state at the time in the Soviet Union and in East Germany. And the language in the Georgetown case indicates that in the rubric of a single entity that controlled all input costs and all export costs, all finished product costs, controlled where, when, what, and to whom products were sold, you had a single entity controlled by central planning. If you look at the Georgetown Steel memo, what you find is that the price controls that were one of the key elements in the Georgetown case, factually, in the countries that were being looked at at the time, no longer exist. As opposed to a single entity, the state, which is doing the trading and doing the production and making the allocation of resources, you now have hundreds of thousands, if not millions of companies that are engaged. So your position is that the statement that Chief Judge Rader read earlier and that I alluded to in Georgetown Steel shouldn't be taken broadly out of the happened in the Zenith case, where this court reminded people that it's a maxim that you have to read the language in the context of the facts that were before the court at the time. The cases at the time were centrally planned, monolithic Soviet-style countries. That is not the case in the situation of China, as the Georgetown Steel memo makes very clear that the agency relies on. But there is some suggestion in the legislative history, is there not, that that language was considered fairly broadly, perhaps not entirely in context, but nonetheless considered fairly broadly. You have some views from the agency, and you have the agency that has re-examined the underlying premise. You have statements in the committee reports, in 88 and 94, explicit statements that seem to say that you don't have countervailing duty in non-market economy situations. And they refer to the Georgetown, and the Department of Commerce in all likelihood would continue to find that you could not determine the subsidies if you had a centrally planned monolithic state. So there is no inconsistency in the statement that the law and the interpretation of this court in Georgetown Steel would still be good law if you still had countries that operated on this. But that's not what the committee report said. They didn't say in a monolithic state. They said countervailing duty law doesn't apply to non-market economies. They didn't distinguish between one non-market economy. In 94, that was Commerce's construction. Wait, wait, wait. You can't interrupt me. They didn't distinguish between one non-market economy and another one, right? The Commerce Department at that time, that was consistent with Commerce's position that they simply looked at, they treated them all as monolithic states. And that flows from the Georgetown underlying cases themselves because that was the construct from which they moved in the direction that they've gone. Thank you, Mr. Stewart. Thank you, Your Honor. Mr. Durling, we're going to return to Mr. White a minute of his rebuttal. And so we'll give you an additional three minutes because we went over with Mr. White and we're giving him a minute back. So if you need to use it, you'll have 18 minutes. Thank you, Your Honor. May it please the Court, I'm appearing today on behalf of all of the Applees, GPX, Hebe, Starbright, and Tutrix. So I'll be presenting all of the arguments. Your Honor, this case is fundamentally about the Commerce Department making a designation of a country as a non-market economy. They made a designation. They looked at the facts. Which is not a reviewable issue. Correct. It is not a reviewable issue, Your Honor. But the designation as a non-market economy then has consequences. And what the case is really about is the agency is trying to escape from the consequences of having designated China as a non-market economy. With all due respect, the decision in Georgetown Steel started with this as a premise. Georgetown Steel specifically states that commerce designated certain countries as non-market economies. That is the starting point. The Court did not go behind the designation because they chose not to then and since then the statute has made clear that's not a reviewable decision. But commerce wants to go behind it now. They want to say there are some kind of market economies you treat one way and this one is changed. That's correct, Your Honor, but the statute only permits one bright line. The statute says a country is either a non-market economy, it's treated in this way, or it's a market economy and then a different set of rules apply. And that's the framework that commerce presented to this Court 20 years ago. That's the framework that this Court accepted in Georgetown Steel and that's the framework that Congress ratified twice in 1988 and in 1994. So we have a framework that is based on the statute and the operation of the statute. I think it's particularly important to note that in Georgetown Steel the Court took pains to point out both the definition of non-market economy, which was found at page 1314 of the reported decision, page 1314, where the definition of non-market economy, it was the agency definition, is a country that has prices and costs determined on a non-market basis. And that's the language that ultimately was codified in the statute as the definition. But the statement that we've been alluding to in Georgetown Steel about subsidizing themselves is in a paragraph that refers to the Iron Curtain countries. Yes, but Your Honor, I think that reference to the Iron Curtain countries is simply a reference to the countries that had been designated in that case as non-market economies. Yes, the statement was made in the context of imports from those countries. Your Honor, but what the agency is trying to do here is create a third category, a category of hybrid countries, which is not permitted by the statute because the statute draws just one line and it is a position that the agency itself has repeatedly told Congress does not exist. Part of your problem, it seems to me, is a question of what's Georgetown Steel held. Did it interpret the statute or did it defer to the agency's interpretation based on Chevron? There's language that, in the opinion, that could support both points of view. If it's a Chevron deference case, you have a problem, right? Because agencies can change their minds and reach a different conclusion. Your Honor, I recognize the Georgetown Steel has language that would permit either interpretation. In our view, the analysis set forth in the first four pages of the Georgetown Steel decision presents a basic framework for addressing this question that was appropriate then and it is appropriate now. It is an appropriate way to think about how you construe the statute and you interpret the statute to discern congressional intent. In our view, what the first part of Georgetown Steel was all about was basically trying to ascertain congressional intent. And for all the reasons the court gave, congressional intent was quite clear then. And using the same analysis today... But if we read it as a Chevron case, there's no problem here, right? The agency could change its mind. With all due respect, Your Honor, we would take the position that even under Chevron prong two, this would be an unreasonable interpretation by the agency. It would be an unreasonable interpretation first because the agency is engaging in an inconsistent interpretation. Basically, the agency is trying to say that at the same... But that's always true when agencies change their minds. No, but it's not inconsistent over time, Your Honor. It's inconsistent in that having designated China as a non-market economy, in other words, having made a factual finding that markets do not operate in China, having made that finding, they can't then turn around and say that, well, but markets are operating a little bit. The definition of a non-market economy is quite emphatic. Markets do not operate. And so you can't say that markets do not operate and then impose special anti-dumping rules on that basis and then with the next breath say, well, okay, but markets are operating a little bit and so we're going to create this hybrid category. They're creating a hybrid category that is fundamentally inconsistent with the designation of China, in this case, as a non-market economy. So that's one problem under prong two. The second problem under prong two, as Judge Rustani developed at some length, is the situation of a double remedy. You cannot impose two remedies for the same underlying distortion. Who says? I mean, where do you find that in a double remedy? I don't see where the statute doesn't say that you can't have a double remedy. Your Honor, with all due respect, there have been a number of cases where courts have addressed the issue of double remedies, I think most prominently in Wheatland Tube, where the court made very clear in the context of whether it's permissible to essentially have Section 201 duties and then anti-dumping duties as well, the court made very clear and said that it would not be appropriate to remedy substantially overlapping injuries twice. Now, Mr. Durling, can you properly remedy this under anti-dumping laws? Absolutely, Your Honor, absolutely. When Congress adopted this, when Congress ratified this scheme... Debt forgiveness? Yes, absolutely, because the way the non-market economy's rules work, Your Honor, is it's not the precise calculation that's being done under the normal dumping statute. What happens is commerce goes outside of the non-market economy country, they go out to a market economy to calculate benchmark. We understand how that works. And so they're going out and deeming in a kind of blunt sort of way, what is a fair price? And then they're saying, okay, the fair price is this, this is the U.S. price, is the U.S. price lower than the fair price? Your Honor, it is admittedly a blunt instrument, but it's the instrument that Congress gave for dealing with this problem. This is the tool that Congress gave the agency for dealing with the problem of distorted U.S. prices from non-market economies. The agency has... What you're assuming is that there's a pass-through into the export price, right? Not necessarily, Your Honor, because it's simply a question under the non-market economy rules, we're not struggling with a comparison with prices in the home market. We're not struggling with how to calculate the precise amount of a substitute. Each side seems to say, we really can't tell whether it's a pass-through or not, right? No, Your Honor, with all due... Isn't that true that both sides say that, that we can't really tell whether it's a pass-through? No, I think what both sides would say, Your Honor, is that it's difficult to measure the amount of pass-through. Okay. Okay. So, but the question is, if you're not sure... So, if it's not a complete pass-through, then anti-dumping law doesn't provide a complete remedy. No, Your Honor, with all due respect, it does provide a complete remedy because the purpose is not... The purpose of the anti-dumping law is not to calculate the precise amount of a dumping or the precise amount of a subsidy. The purpose of non-market economy rules is to have this kind of blunt offsetting duty. So, Congress recognized the challenges of trying to ascertain and measure a subsidy in the context of a non-market economy, where the whole definition of a subsidy is, do you have some distortion from a market norm? I mean, that's the very definition that Georgetown Steel cited, that what is a subsidy? Well, a subsidy is when you have a distortion of market processes. That's at page 1315 of the Georgetown Steel decision. So, if the definition of a subsidy is you have a departure from the market and you have an agency determination that markets do not operate in a country, that's the definitional conflict which Georgetown Steel addressed. And even if you're not convinced on the terms of the statute that this is Chevron prong one, we would submit that that fundamental inconsistency makes the agency interpretation here unreasonable. The agency hasn't reconciled how it can, at the same time, say markets don't work and we can calculate the amount of a subsidy. They simply have not shown that, Your Honor. But, in our view, this case could be decided under either Chevron prong one or Chevron prong two, because we have the irrational interpretation, we have the double remedy, and we also have, Your Honor, an agency interpretation that is so at odds with the 20 years of history, I recognize they can change their mind, but this is a different situation with the passage of time, Your Honor, because this isn't a case where you have a judicial interpretation that's out there and is never acknowledged and is never recognized. This is a case that clearly meets the plainly raised standard that was raised in the U.S. brief. Was this issue plainly raised before Congress? And it clearly was. It was raised not once, it was not raised in people just stating it, it was raised and then codified in the committee reports and, even more importantly, Your Honor, in the statement of administrative action, a particularly definitive form of legislative history. When Congress was revisiting the issue of the statute, when people proposed to give commerce the authority they now assert, Congress said no. Mr. Dierling, how will this ever change? What if this tire company divorces itself completely from the government and does business on a total market basis? How will we ever, because they happen to be located in China, are they exempt then from the rest of the rules? No, Your Honor, they're not exempt from the rules. There are a number of options that would be available, okay? Option number one, if China truly has changed, the agency can revisit the designation of China as a non-market economy. They revisit that designation and they can apply all of the rules exactly in the way that Congress contemplated for countries that are market economy. Option number two, they have the discretion under their practice to say that a particular industry has become sufficiently market-oriented that they will now apply the market economy rules. Again, when you look at those agency decisions, again, this bright line distinction comes through consistently. If we say that an industry is market-oriented, then we'll apply market-oriented dumping and we'll apply market-oriented countervailing duty law. Or even more recently, there's a new practice. We can have a market-oriented company. Commerce has never actually found one, but that does exist under their discretion. This is a case where the agency did not reconsider its designation of the country, did not find a market-oriented industry, didn't find a market-oriented enterprise. They just said, everything in this case is non-market, markets don't work, but even so, we're going to say that for purposes of the countervailing duty case, all of a sudden markets exist even though we've just found that the markets don't exist. And so, in our view, the statute properly interprets it, interpreted holistically, taking into account both the definitions of non-market economy, the definitions of subsidies, taking into account all of the congressional history on this issue, is in fact a clear congressional intent. There is a clear congressional intent here not to apply the countervailing duty law to those countries that have been designated as non-market economies. And that's the test of Chevron prong one. Is there a clear congressional intent? We submit that there is a clear congressional intent here. But even if you don't agree with that, Your Honor, under Chevron prong two, the agency interpretation here is unreasonable. They are saying there is no need to make any adjustments at all. Judge Rustani gave the case back to them, gave them clear guidance to address the issue of double remedy, to make the joint administration reasonable, and the agency said we can't. The agency says the statute ties our hands, and so we can't make any adjustments. So the agency refused to make adjustments, and that's what led Judge Rustani to what was a reasonable ultimate conclusion. That is, if you say you can't make any adjustments, if you can't deal with the double remedy problem and make your interpretation reasonable, then you simply can't impose the countervailing duties. When you find a way to reasonably impose countervailing duties, then the agency may have discretion. In our view, Judge Rustani was right for both the reason that this case meets Chevron prong one, but also because she was correct in her analysis of Chevron prong two. And if there Mr. White, you have one minute. I'll make it brief, Your Honor. The first point I want to make is that where GPX is arguing in a way that is inconsistent with the statutes entirely is this idea that because there is an NME designation for the purposes of anti-dumping law, that that has some relevance to the application of the countervailing duty statute, an entirely different remedy for an entirely different problem. There is no impact on the countervailing duty law based on a distortion in price, which is what you heard counsel refer to in a number of instances. And also, there is some imprecise dicta in the Georgetown Steel opinion that also refers to price effects. The statute's clear. What is a subsidy, if not that? Subsidy is the government of a country provides a million dollars to a producer, the Department of Commerce. And it affects the price. Come on, be an economist. There is no price effect. Congress has specifically stated in the definition of a subsidy in Section 1677 that there is a subsidy to be measured without regard to an impact at all. So whether it makes a benefit, affects the producer in any particular way, that results in a lower price, either domestic price or export price, we're talking about an entirely different thing. So this coordination is unnecessary for that reason. Thank you, Mr. White. That concludes